## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

FERNANDO SAINT-JEAN,

                Plaintiff,

                v.

COUNTY OF BERGEN, *et al.*,

                Defendants.

**Civ. No. 19 -10680 (ES) (MAH)**

**OPINION**

McNULTY, DISTRICT JUDGE

Before the Court is a motion (DE 29) to dismiss the complaint filed by defendants Palisades Interstate Park Commission ("PIPC"), Palisades Interstate Parkway Police Department ("PIPPD"); Andrew Samson ("Prosecutor Samson"); and four police officers, Michael Holland, Fabricio M. Salazar, Peter Wojckik, and Richard Dey (the "Officer Defendants"). The matter has been reassigned from Judge Salas to me for purposes of deciding this motion. Having considered the relevant submissions, I decide the motion without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons stated below, Defendants' motion is GRANTED as to defendants PIPC, PIPPD, and Prosecutor Samson. As to the Officer Defendants, the motion is GRANTED IN PART and DENIED IN PART.[1]

---

[1]     The County of Bergen, also named as a defendant, has been voluntarily dismissed from this action (DE 5).

The plaintiff, who was arrested, handcuffed, and detained for a period of hours, does not seem to have been guilty of anything at all. The police made a mistake here, as officers going about the difficult business of law enforcement inevitably will. On the facts as alleged in the complaint, they erred inexcusably; on the facts that the police seemingly plan to adduce at the proper time, they did so excusably. Accepting, as I must, the truth of the facts as alleged in the complaint, I must withhold a finding of qualified immunity and deny in part the motion to dismiss as to the Officer Defendants.

## I.    BACKGROUND[2]

The plaintiff, Fernando Saint-Jean, identifies himself as a black male of Haitian descent, a U.S. citizen, and a resident of Massachusetts, facts relevant to certain of his claims. (Complaint ¶ 17).

On May 6, 2018, defendant Officer Holland pulled Mr. Saint-Jean over while he was driving back to Massachusetts after visiting relatives in New Jersey. (*Id.* ¶¶ 19–24). Officer Holland allegedly requested identification from both Mr. Saint-Jean and his passenger, his uncle. (*Id.* ¶¶ 20 & 24). Officer Holland asked the men what country they were from; they responded that they were from Haiti but were United States citizens and residents of Massachusetts. (*Id.* ¶ 25). Officer Holland informed Mr. Saint-Jean that he was

---

[2]  Citations to documents in the record will be abbreviated as follows:

  Complaint = Plaintiff's complaint, DE 1

  Mov. Br. = Defendants' brief in support of their motion to dismiss, DE 29-3

  Opp. Br. = Plaintiff's brief in opposition to the motion to dismiss, DE 32

  Reply Br. = Defendants' reply in support of their motion to dismiss, DE 35

pulled over for driving too slowly and for having tinted windows, allegedly in violation of N.J. Stat. Ann. § 39:3-75.1. (*Id.* ¶ 26).

During this exchange, defendant Officer Salazar pulled up alongside Officer Holland. (*Id.* 28). Officers Holland and Salazar then instructed Mr. Saint-Jean and his uncle to step out of the vehicle. (*Id.* ¶ 29). Holland brought Saint-Jean behind his police vehicle and conducted a pat-down search. (*Id.* ¶ 30). During the pat-down of Saint-Jean, a third officer, defendant Officer Wojckik, arrived on the scene to aid in the investigation of Saint-Jean and his uncle. (*Id.* ¶ 31).

Mr. Saint-Jean alleges that he inquired as to why an investigation of tinted windows required three police vehicles, but he received no answer. (*Id.* ¶¶ 32 & 33). By this point, Saint-Jean says, he "was mentally distressed and visibly shaking because he was nervous and stressed about being pulled over, being asked to get out of the vehicle, and being patted down . . . ." (*Id.* ¶ 32).

Officers Holland, Salazar, and Wojckik then requested consent to search Mr. Saint-Jean's car, and Saint-Jean signed a consent-to-search form.[3] (*Id.* ¶¶ 33–34). During a search of the console storage compartment between the driver's and passenger's seats, the officers discovered "zip lock bags containing Valentine's Day sugar candies that Saint-Jean had received from his co-worker." (*Id.* ¶ 36). The officers then questioned Saint-Jean as to the contents of the bags. (*Id.* ¶¶ 37–38). Saint-Jean responded that they were Valentine's

---

[3]    The basis, if any, for the officers' request to search the car is not revealed by the complaint.

Day candies and offered to provide the officers with the telephone number of the co-worker so that she could confirm the contents. (*Id.* ¶ 38). The officers declined Saint-Jean's offer, and instead arrested Saint-Jean for possession of a controlled substance in the third degree, in violation of N.J. Stat. Ann. § 2C:35-10a(1), and for the motor vehicle violation of having tinted windows, supposedly in violation of N.J. Stat. Ann. § 39:3-75.1. (*Id.*).

Mr. Saint-Jean was taken to the police station, where he was handcuffed to a bench and interviewed by Officer Salazar. (*Id.* ¶ 44). He was fingerprinted, photographed, and charged with possession of MDMA/Ecstasy[4] and issued a traffic summons for improperly tinted windows. (*Id.* ¶ 45). The officers allegedly reassured Saint-Jean that the charge would be dismissed if he stayed out of trouble for six months. (*Id.* ¶ 46). Saint-Jean was released at approximately 3:50 p.m., without being required to post bail. He was given a criminal complaint summons to appear at the Bergen County Superior Court on May 22, 2018. (*Id.* ¶ 47).

On May 16, 2018, Mr. Saint-Jean's charge was downgraded to use or possession with intent to use drug paraphernalia, in violation of N.J. Stat. Ann. § 2C:36-2. (*Id.* ¶ 58). Then, on July 27, 2018, the New Jersey State Police Office of Forensic Sciences completed a chemical analysis of the candies that were found in Saint-Jean's vehicle. The result was that there was "no controlled dangerous substance detected." (*Id.* ¶ 59). Saint-Jean received that lab report

---

[4]     Formally, 3,4-methylenedioxymethamphetamine.

on August 17, 2018, and immediately requested that Municipal Prosecutor Samson, defendant here, dismiss the charge. (*Id.* ¶ 60).

The prosecution of Mr. Saint-Jean nevertheless continued for several months after the drug analysis report confirmed that the candies were not drugs. (*Id.* ¶¶ 61 & 63). Saint-Jean was required to appear in court approximately two or three more times thereafter. (*Id.* ¶ 65). On or about November 14, 2018, all charges were dismissed. (*Id.* ¶ 66–67).[5]

Based on this set of facts, Mr. Saint-Jean brings federal claims against all Defendants under 42 U.S.C. § 1983 for false arrest (Count I); malicious prosecution (Count II); failure to supervise (Count III); violation of substantive due process (Count V); and violation of procedural due process (Count VI). Against PIPC only, Saint-Jean asserts a § 1983 *Monell* municipal-liability claim. (Count IV). Saint-Jean also brings pendent state law claims against all Defendants for false imprisonment (Count VII) and malicious abuse of process/malicious prosecution (Count VIII).[6]

---

[5]    Saint-Jean alleges that on or about November 14, 2018, his case proceeded to trial and that he was not guilty. The wording of the Complaint, however, is somewhat inconsistent, and seems to admit the possibility that the charges were dismissed at some point before trial. (Mov. Br. at 6 & n.3). This fact, which does not affect the substance of this motion, should be ascertainable *via* discovery or public records.

[6]    The individual defendants are being sued in their individual capacities only. (*See* Complaint ¶¶ 8–11 & 13).

## II.    LEGAL STANDARDS

Defendants move to dismiss all claims against them pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). They assert, *inter alia*, sovereign immunity as to PIPC and PIPPD, prosecutorial immunity as to Prosecutor Samson, and qualified immunity as to the Officer Defendants.

### A.    Rule 12(b)(1) Standard

Because "[t]he Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction," Defendants' motion is, in part, a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 693 n.2 (3d Cir. 1996).

Typically, once a Rule 12(b)(1) challenge is raised, the burden shifts to the plaintiff to demonstrate the existence of subject matter jurisdiction. *See McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006). "However, because 'Eleventh Amendment immunity can be expressly waived by a party, or forfeited through non-assertion, it does not implicate federal subject matter jurisdiction in the ordinary sense,' and therefore, a party asserting Eleventh Amendment immunity bears the burden of proving its applicability." *Garcia v. Knapp*, No. 19-17946, 2020 WL 2786930, at *3 (D.N.J. May 29, 2020) (quoting *Christy v. PA Tpk. Comm.*, 54 F.3d 1140, 1144 (3d Cir. 1994)).

In deciding a Rule 12(b)(1) motion, "a court must first determine whether the party presents a facial or factual attack because the distinction determines how the pleading is reviewed." *Leadbeater v. JPMorgan Chase, N.A.*, No. 16-

6

7655, 2017 WL 4790384, at *3 (D.N.J. Oct. 24, 2017). "When a party moves to dismiss prior to answering the complaint . . . the motion is generally considered a facial attack." *Id.*; *see also Garcia*, 2020 WL 2786930, at *4 ("Defendants, by asserting Eleventh Amendment immunity, raise a facial 12(b)(1) challenge."). In reviewing a facial attack, the Court should consider only the allegations in the complaint, along with documents referenced therein and attached thereto, in the light most favorable to the nonmoving party. *See Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014).

Thus, a facial motion is handled much like a 12(b)(6) motion, and allegations in the complaint are accepted as true. *Leadbeater*, 2017 WL 4790384, at *3.

### B.     Rule 12(b)(6) Standard

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"When reviewing a motion to dismiss, all allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560,

563 (3d Cir. 2011) (internal quotation marks omitted). The Court is not required to accept as true "legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Finally, "[i]n deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III.   FEDERAL CLAIMS (COUNTS I– VI)

### A.   PIPC and PIPPD

Defendants argue that all federal claims against PIPC and PIPPD must be dismissed because they enjoy Eleventh Amendment immunity and because they are not "persons" subject to suit under § 1983. (Mov. Br. at 32–42). Mr. Saint-Jean concedes that the federal claims against PIPC and PIPPD should be dismissed. (Opp. Br. at 28).

Section 1983 provides a cause of action against a person who, while acting under color of law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The purpose of § 1983 is, in part, "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). While on its face § 1983 affords

no immunities, the Supreme Court has "accorded certain government officials either absolute or qualified immunity." *Id.* at 163–64.

The Eleventh Amendment protects non-consenting states from suits brought in federal court by private citizens seeking money damages. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); U.S. CONST. amend. XI. Eleventh Amendment immunity can extend to state agencies and instrumentalities acting as arms of the state. *Regents of the University of California v. Doe*, 519 U.S. 425, 429 (1997). An entity is characterized as an arm of the state when the state is the "real party in interest," and a judgment against it "would have essentially the same practical consequences as a judgment against the State itself." *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 546 (3d Cir. 2007) (quoting *Fitchik v. N.J. Transit Rail Operations*, 873 F.2d 655, 659 (3d Cir.1989)).[7]

Separately, but along the same lines, only "persons" are subject to suit under § 1983. States and governmental entities that are considered "'arms of the state' for Eleventh Amendment purposes" are not persons subject to suit under § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989).

For these reasons, and as conceded by Saint-Jean, the federal claims against PIPC and PIPPD are barred. The § 1983 claims and the *Monell* claim

---

[7]     To make this determination in disputed cases, the Third Circuit considers three factors: "(1) whether the money to pay for the judgment would come from the state; (2) the status of the agency under state law; and (3) what degree of autonomy the agency has." *Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850, 857 (3d Cir. 2014) (citing *Fitchik*, 873 F.2d at 659).

alleged against PIPC and PIPPD in Counts I through VI of the Complaint are therefore dismissed.

### B.   Prosecutor Samson

Defendants argue that all of the federal claims against Prosecutor Samson should be dismissed based on prosecutorial immunity or, alternatively, qualified immunity. (Mov. Br. at 27–31). Mr. Saint-Jean responds that absolute immunity does not apply here, citing to certain exceptions in New Jersey state law, and further argues that Samson is not entitled to qualified immunity. (Opp. Br. at 25–27). Because I agree with Defendants that the claims against Samson should be dismissed based on absolute prosecutorial immunity, I do not address the qualified immunity issue.

As to these federal § 1983 claims, the Court applies federal, not state, standards in analyzing prosecutorial immunity. Prosecutors "are immune from suit under § 1983 when 'act[ing] within the scope of [their] duties in initiating and pursuing a criminal prosecution.'" *LeBlanc v. Stedman*, 483 F. App'x 666, 669 (3d Cir. 2012) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 422–23 (1976)). Prosecutorial immunity "is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties." *Imbler*, 424 U.S. at 422–23. The prosecutor bears the burden of demonstrating entitlement to absolute immunity. *Odd v. Malone*, 538 F.3d 202, 207 (3d Cir. 2008).

Absolute prosecutorial immunity applies when a prosecutor is working within the judicial process, thereby functioning as the state's advocate. *Id.* at

10

430; *Odd*, 538 F.3d at 208. Initiating a prosecution and presenting the state's case are core advocacy functions; when performing them, prosecutors are absolutely immune from § 1983 claims. *Id.* at 431. That immunity extends somewhat farther, to other activities "intimately associated with the judicial phase of the criminal process." *Burns v. Reed*, 500 U.S. 478, 486 (1991) (quoting *Imbler*, 424 U.S. at 430).

A prosecutor is not entitled to absolute immunity, however, for actions that fall outside of those essential prosecutorial functions. *See, e.g.*, *Buckley v. Fitzsimmons*, 509 U.S. 259, 276–78 (1993) (prosecutor not entitled to absolute immunity when holding press conference or fabricating evidence during a preliminary investigation); *see also Yarris v. Cty. of Delaware*, 465 F.3d 129, 137 (3d Cir. 2006) (prosecutor not entitled to immunity for deliberately destroying exculpatory evidence).

It is not enough, then, simply to identify the defendant as a prosecutor. The court must take a functional approach, analyzing the nature of the conduct complained of and its relation to the judicial and prosecutorial process. *Schrob v. Catterson*, 948 F.2d 1402, 1409 (3d Cir. 1991).

Ordinarily, the Court assesses absolute immunity as to each claim asserted against a prosecutor. *Fogle v. Sokol*, 957 F.3d 148, 161 (3d Cir. 2020). Here, however, Mr. Saint-Jean pleads most of the counts in the Complaint in blanket fashion, against prosecutors and non-prosecutors alike, and does not always specify how the conduct of each individual defendant is relevant to each claim. I have, however, selected the claims (or parts of claims) which, by their

11

nature, appear to be directed against Prosecutor Samson. I conclude that they are subject to prosecutorial immunity.

One such claim might be based on the initiation of the prosecution. Mr. Saint-Jean does not clearly allege that Prosecutor Samson was involved in initiating the prosecution against him. (Complaint ¶¶ 57 & 86 (alleging that the prosecution was initiated against Saint-Jean "by Defendants" with malice); *id.* ¶ 87 (alleging generally that "Plaintiff's race was the motivating factor behind the decision to prosecute Plaintiff"); *id.* ¶ 88 (alleging that when the prosecution was commenced "Defendants had knowledge that Plaintiff . . . was innocent of the charges alleged against him."). Assuming such an allegation was intended, it would fall squarely within the scope of absolute prosecutorial immunity. *Imbler*, 424 U.S. at 422–23; *Schrob*, 948 F. 2d at 1411 ("A prosecutor's alleged failure to properly investigate before initiating a prosecution is also conduct within the scope of absolute immunity.").

The other claim that potentially applies to Prosecutor Samson would be based on the decision to *continue* to prosecute Mr. Saint-Jean, even after forensics laboratory test results came back negative for any controlled substance. (Complaint ¶¶ 6–61, 89 & 99). But decisions to continue prosecutions, like decisions to initiate prosecutions, are covered by prosecutorial immunity. *Davis v. Grusemeyer*, 996 F.2d 617, 629 (3d Cir. 1993) ("[T]he decision whether to continue a prosecution through to trial is at the heart of the prosecutorial decision making process and should not be chilled by fear of civil sanction."); *Henderson v. Union Cty., N.J.*, No. 14-7708, 2017 WL

4861622, at *4 (D.N.J. Oct. 27, 2017) (finding that prosecutors had immunity for "their actions in initiating and continuing [p]laintiff's prosecution").

Accordingly, Prosecutor Samson is entitled to absolute immunity under federal law. The federal claims against him are dismissed.[8]

### C.   Officer Defendants

The remaining federal claims are those alleged against the Officer Defendants. The Officer Defendants claim qualified immunity, and also argue in overlapping fashion that certain allegations fail to state a claim. (Mov. Br. at 8–26).

Qualified immunity is not just immunity from liability, but also "immunity from suit." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). It protects all government officials "but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Because the "driving force" behind the creation of qualified immunity was to ensure "that 'insubstantial claims' against government officials will be resolved prior to discovery," it is important that the immunity question be resolved "at the earliest possible stage in litigation." *Id.* at 231–32 (citations omitted); *see also Mitchell*, 472 U.S. at 526 ("Unless the plaintiff's allegations state a claim of

---

[8]     Plaintiff's arguments regarding malice, fraud and willful misconduct are grounded in New Jersey state law (*see* Opp. Br. at 26), not federal law, *see Cresci v. Gyess*, No. 17-2342, 2018 WL 4961466, at *5 (D.N.J. Oct. 15, 2018), *aff'd sub nom. Cresci v. Gyss*, 792 F. App'x 226 (3d Cir. 2020) ("But it is the prosecutorial function, not the rightful or wrongful exercise of that function, which gives rise to immunity."); *Jennings v. Shuman*, 567 F.2d 1213, 1221–22 (3d Cir. 1977) (absolute immunity applies even where a prosecutor is motivated by "a corrupt or illegal intention"). I address these arguments in more detail in my analysis of the state law claims against Prosecutor Samson. (*See* Section IV.B, *infra*.)

violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.").

Whether a defendant is entitled to qualified immunity involves a two-pronged analysis: the court must determine whether (i) the defendant "violated a constitutional right," and (ii) "the right that was violated was clearly established." *Curley v. Klem,* 499 F.3d 199, 206–07 (3d Cir. 2007) (quoting *Saucier v. Katz,* 533 U.S. 194, 202 (2001)). Courts should exercise "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, I elect to consider first the constitutional merits—essentially, whether the Officer Defendants arrested or prosecuted Mr. Saint-Jean without probable cause. That analysis substantially overlaps with the Rule 12(b)(6) analysis of whether the complaint states a claim on which relief may be granted. I then consider whether any such constitutional violation was clearly established.

### 1.    False Arrest and Malicious Prosecution

To state a claim for false arrest under the Fourth Amendment, a plaintiff must establish that (i) there was an arrest (ii) made without probable cause. *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012). If probable cause existed for the arrest, there has been no constitutional violation and therefore no cognizable § 1983 claim. *Startzell v. City of Philadelphia*, 533 F.3d 183, 204 & n.14 (3d Cir. 2008).

A claim of malicious prosecution under the Fourth Amendment guise, requires a plaintiff to establish the following elements:

> (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [the plaintiff's] favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*Halsey v. Pfeiffer*, 750 F.3d 273, 296–97 (3d Cir. 2014) (quoting *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007)). "Although prosecutors are the ones who typically initiate criminal proceedings, a law enforcement officer may be liable for malicious prosecution where the officer 'influenced or participated in the decision to institute criminal proceedings.'" *Evans v. City of Newark*, No. 14-00120, 2016 WL 2742862, at *14 (D.N.J. May 10, 2016) (quoting *Halsey*, 750 F.3d at 297). And as with a false arrest claim, "the *sine qua non* of malicious prosecution is that the defendants have instituted a criminal proceeding without probable cause." *Evans*, 2016 WL 2742862, at *14.

Defendants argue that both of these claims must be dismissed because the Officer Defendants had probable cause to arrest and charge Saint-Jean with possession of a controlled substance and having illegally tinted automobile windows. (Mov. Br. at 10). Plaintiff demurs. (Opp. Br. at 10–22).

### a. Probable cause

"Probable cause to arrest requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482–83 (3d

15

Cir. 1995). "To determine whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996))). "[T]he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts." *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983).

### i.      Possession of CDS

Mr. Saint-Jean alleges that the police lacked probable cause to arrest him for possession of a controlled dangerous substance based on (i) his truthful explanation that the items found in the plastic bag were Valentine candies; (ii) his offer, which the police declined, to provide his coworker's phone number for verification of that fact; and (iii) the officers' failure to conduct field tests or employ any other method to test the candies. (Complaint ¶¶ 37–38, 49 & 51).

Defendants, on the other hand, argue that the candies in a plastic zipper storage bag in the center console of Saint-Jean's vehicle, when combined with Saint-Jean's admitted nervousness during the search, were sufficient for a reasonable officer to conclude that Saint-Jean possessed illicit drugs. (Mov. Br. at 15–17). Defendants also argue that the police were not required to accept Saint-Jean's proffered explanation or accept his offer to telephone his coworker to verify that these were Valentine candies. They add that the explanation was

inherently suspicious because the traffic stop occurred in the month of May, some three months after St. Valentine's Day.[9] (*Id.* at 16).

Defendants may or may not ultimately be correct; what is clear now is that their contentions in rebuttal cannot be established from the face of the Complaint. Defendants seize on Mr. Saint-Jean's limited use of the word "tablets" to describe the items he generally describes as candies, and in their briefing Defendants state that, to the police, the items "appear[ed] similar to ecstasy pills." (Reply Br. at 6). The Complaint, however, describes the purported drugs as "Valentine's day sugar candies." (Complaint ¶ 36). In his briefing, plaintiff adds that the candies were heart-shaped. (Opp. Br. at 3). Neither side's elaboration on the appearance of the candies can be gleaned from the Complaint, however. The Complaint does not describe the candies' appearance, smell, or taste. There is also no indication of how many candies were in the bag, or how big the bag was.[10] The bag was not concealed in a

---

[9]    The Court has not been anyone's valentine for some years, but my recollection is that hard candies, like young love, may abide unspoiled for months, so the significance of the May date may not be great.

[10]    Defendants argue that "the case law is replete with examples of illicit pills being stored in plastic bags in vehicles." (Mov. Br. at 15). That argument assumes, rather than establishes, that the bags contained pills. If extended, this argument would encompass some absurd results, given the wide range of legal uses of such bags. The cases cited, moreover, do not help answer the question presented here. *See Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 390 (2009) (evaluating whether a school principal had a reasonable suspicion to justify a strip search of a student and briefly mentioning a case in which a plastic bag containing pink and orange pills was concealed in undergarments); *United States v. Pojilenko*, No. 09-112, 2012 WL 1392362, at *6 (E.D. Pa. Apr. 20, 2012) (explaining that the officers had probable cause to search a vehicle once they saw what appeared to be a bag containing drugs sticking out of the glove compartment and petitioner attempted to shield the drugs from view); *United States v. Gooch*, 915 F. Supp. 2d 690, 717 (W.D. Pa. 2012) (holding that an officer's observation of a loose trunk liner and a piece of plastic bag would lead a reasonable officer to conclude that the vehicle contained a hidden compartment and

17

manner indicative of drug transportation. In other words, there is no indication as to what it was about the candies that could lead a reasonable officer to believe they contained the illegal drug MDMA/Ecstasy.

One factor contributing to a finding of probable cause may be an officer's "specialized training and experience." *United States v. Yusuf*, 4461 F.3d 374, 390 (3d Cir. 2006). Here, however, there is no available information about the officers' training or experience with respect to detection of MDMA/Ecstasy, or the reasonable steps they could have taken to confirm or dispel their suspicions.

Cases upholding a finding of probable cause based on the officers' mistaken identification of a controlled substance have generally involved some more substantial reason to believe the substance was contraband. Factors have included plants, powders, or crystals that resembled controlled substances; possession by an intoxicated person of an item that resembled an illegal drug; field test results which later turned out to be wrong; or the like.[11] Simply hypothesizing that candies might contain drugs is not sufficient.

_____

that the hidden compartment, in conjunction with other facts of the case, gave the officer probable cause to search); *Nieves v. Ortiz,* No. 06-5206, 2008 WL 4004940, at *9 (D.N.J. Aug. 20, 2008) (discussing whether officers had probable cause to charge inmate with possession of contraband pills found in a plastic bag and concluding that issues of fact precluded such a determination); *Selby v. Wenerowicz*, No. 14-4904, 2015 U.S. Dist. LEXIS 176549, at *10 (E.D. Pa. Apr. 2, 2015) (officers saw in plain view a plastic baggie with a white powdery substance in it and another with a green leafy substance).

[11]      *Fincher v. Monroe Cty. Bd. of Commissioners,* No. 18- 00424, 2020 WL 1518625 (M.D. Ga. Mar. 30, 2020) (finding probable cause on full summary judgment record where, after traffic stop for tinted windows, officers conducted a consent search and field test of blue cotton candy produced a false positive result); *Zien-Al-Abedeen v. Teolis*, No. 17-12063, 2018 WL 3861712 (E.D. Mich. Aug. 14, 2018) (finding probable

*Brian v. Patrick*, No. 15-541, 2016 WL 394002 (M.D. La. Feb. 1, 2016), if not precisely on point, is close. There, the plaintiff was stopped and searched in a grocery store by the defendant officer. In his front pocket was a bag containing what looked like Halloween candy. The plaintiff explained that he had purchased the candy from a CVS after Halloween, and three bystanders confirmed that it was Halloween candy. The officer, without conducting a field test, declared that the substance was Ecstasy. He sent a photo to a lieutenant in the narcotics division, who said he had never seen Ecstasy that resembled the item in the photo. The officer nevertheless arrested plaintiff and charged him with possession and distribution of an illegal drug. Unfortunately, that plaintiff, unlike Mr. Saint-Jean, spent some 90 days in jail before a lab test revealed the substance was indeed candy, and the charges were dismissed.

The plaintiff sued the officer for, *inter alia*, false arrest under § 1983. On a motion to dismiss, the *Brian* court concluded that the complaint adequately set forth a lack of probable cause for the arrest. (It also rejected the officer's assertion of qualified immunity, finding that he had violated a clearly established right. *See* Section III.C.1.b, *infra*.)

---

cause where, during DWI arrest, police seized from car a pill bottle containing a crystalline substance that field-tested positive for crystal methamphetamine, although later laboratory testing was negative); *Waltman v. Payne*, 535 F.3d 342 (5th Cir. 2008) (finding probable cause to seize and destroy crop where, despite negative field test, police and DEA concluded that plants were marijuana, based on appearance, location, and concealment).

Defendants are correct that there is no "requirement" of field testing. The requirement is one of probable cause. Field testing might be one means, but surely is not the only one, of establishing probable cause.

Defendants ask me to supplement the Complaint's allegations with their own facts, assess the totality of the circumstances, and conclude that the officers possessed probable cause for an arrest based on Valentine's day candies found in a plastic bag. That I cannot do. *See Yusuf*, 461 F.3d at 390; *Groman v. Twp. of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995) ("Generally, the existence of probable cause is a factual issue."); *see also Whitlow v. City of Sumiton*, No. 12-1077, 2012 WL 4479269, at *6 n. 3 (N.D. Ala. Aug. 31, 2012) (comparing cases in which courts evaluated probable cause in the context or unidentified pills), *report and recommendation adopted sub nom. Whitlow v. City of Sumiton, Ala.*, No. 12-1077, 2012 WL 4476674 (N.D. Ala. Sept. 20, 2012).

Thus, I cannot rule that Defendants had probable cause for the arrest based on possession of CDS — or rather, I cannot dismiss a claim that they did *not* have probable cause — at this stage of the litigation.[12]

### ii.    Tinted windows

I turn to the issue of probable cause to arrest or charge Mr. Saint-Jean with the petty offense of illegally tinted windows. Whether he would have been,

---

[12]    Plaintiff bases his malicious prosecution claim, in part, on Defendants' decision to continue to prosecute Plaintiff once forensics confirmed that the candies did not contain MDMA/Ecstasy. (Complaint ¶¶ 89 & 94). The Third Circuit has not considered whether a malicious prosecution claim can be based upon such a theory, although other circuits have implicitly authorized such a claim. *Geness v. Cox*, 902 F.3d 344, 359 n.12 (3d Cir. 2018) ("Under our case law to date, a malicious prosecution claim fails so long as 'the proceeding was *initiated* . . . with[ ] probable cause.'" (quoting *Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017)). In any event, however, there are no allegations in the Complaint that the Officer Defendants (as opposed to the already-dismissed State and prosecutorial defendants) "influenced or participated in the decision" to continue (as opposed to initiate) this prosecution. *See Evans*, 2016 WL 2742862, at *14.

arrested based on the tinted windows offense alone may be doubted. It suffices for now that, as to the tinted windows offense, Mr. Saint-Jean has adequately alleged a lack of probable cause.

The Complaint is not a model of clarity. It alleges, without further explanation, that the window tints on Saint-Jean's vehicle were legal, and that the Officer Defendants therefore lacked probable cause. (*See* Complaint ¶¶ 78 & 89). The Officer Defendants argue that the windows were indeed tinted, as they observed at the time. Thus, they assert that they had probable cause to believe the windows violated statutory standards,[13] giving rise to probable cause to arrest and issue a summons. (Mov. Br. at 18).

---

[13]    The stated basis for the tinted glass charge fails the test of transparency. The Defendants' briefing is not much help.

The summons issued by the officers here cited N.J. Stat. Ann. § 39:3-75.1. The Defendants uncritically report this section as defining the crime for which Saint-Jean was properly arrested. Actually, section 75.1 is phrased as an *exception* to laws regarding darkening or tinting of automobile glass:

**39:3-75.1. Certain tinting materials on windshields, windows of motor vehicles, permitted for medical reasons**

1.Notwithstanding the provisions of any other law to the contrary, the owner or lessee of a motor vehicle that is driven by or is used to regularly transport a person who has a medical condition involving ophthalmic or dermatologic photosensitivity may apply to the director for permission to have the windshield and windows of that vehicle covered by or treated with a product or material that increases its light reflectance or reduces its light transmittance.

The application shall be in a form and manner prescribed by the director and shall include, but not be limited to, a written certification by a certified ophthalmologist or a physician with a plenary license to practice medicine and surgery in this State or a bordering state that the person for whom the application is submitted has a medical condition involving ophthalmic or dermatologic photosensitivity. For the purposes of this act, medical conditions involving ophthalmic or dermatologic photosensitivity shall include:

[listing various medical conditions]

A mere error by the police in the statutory citation, however, would not detract from probable cause. *See Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d

Cir. 1994) ("Probable cause need only exist as to any offense that could be charged under the circumstances.").

The officers may have intended to cite N.J. Stat. Ann. § 39:3-75, but that section appears to address only the subject of "safety glazing," and in any event is less than clear about what level of tint would violate it:

**39:3-75. Safety glass**
The term "safety glass" shall be construed as meaning glass so treated or combined with other materials as to reduce, in comparison with ordinary sheet glass or plate glass, the likelihood of injury to persons by objects from exterior sources or by glass when the glass is cracked or broken. The term "safety glazing material" shall be construed as meaning "safety glass"; or other glazing materials, such as plastics, produced for the purpose of safety in glazing; or a combination of safety glass and other safety glazing material. The term "approved safety glazing material" shall be construed as meaning safety glazing material of a type approved by the director. In the approving of safety glazing materials, the director is hereby given authority to make use of recognized standards to confine the use of certain types of safety glazing materials to a specific location in or on the vehicle, or to a certain purpose.

No person shall drive any motor vehicle manufactured on or after July first, nineteen hundred and thirty-five and registered in this State unless such vehicle is equipped with approved safety glazing material wherever glazing is used in doors, windows and windshields. The term "windshield" shall be construed to include wings, deflectors and side shields; also front corner lights adjoining windshields.

Every section of safety glazing material shall be legibly and permanently marked with the manufacturers' distinctive designations, under which the safety glazing material was approved, so as to be visible when installed.

No person shall drive any motor vehicle equipped with safety glazing material which causes undue or unsafe distortion of visibility or equipped with unduly fractured, discolored or deteriorated safety glazing material, and the director may revoke the registration of any such vehicle.

Closer to the mark would have been the ban on obstructions to the driver's vision which is contained in N.J. Stat. Ann. § 39:3-74:

**39:3-74. Windshields must be unobstructed and equipped with cleaners**

 Every motor vehicle having a windshield shall be equipped with at least one device in good working order for cleaning rain, snow or other moisture from the windshield so as to provide clear vision for the driver, and all such devices shall be so constructed and installed as to be operated or controlled by the driver.

The Officer Defendants focus on the facts that they observed, but in doing so they miss the plaintiff's point. Now it is true that an officer's observation of tinted windows on a New Jersey-registered automobile may give rise to probable cause. Judging solely by eye, an officer might reasonably conclude that the windows are so opaque as to violate our State's equipment

---

No person shall drive any motor vehicle with any sign, poster, sticker or other non-transparent material upon the front windshield, wings, deflectors, side shields, corner lights adjoining windshield or front side windows of such vehicle other than a certificate or other article required to be so displayed by statute or by regulations of the commissioner.

No person shall drive any vehicle so constructed, equipped or loaded as to unduly interfere with the driver's vision to the front and to the sides.

Section 39:3-74 has been more frequently cited in the sparse case law regarding tinted windows. *See State v. Cohen*, 790 A.2d 202, 205 (App. Div. 2002); *State v. Doyle*, No. A-4074-16T2, 2018 WL 3117868, at *1 (N.J. Super. Ct. App. Div. June 26, 2018) ("Before the motion judge and on appeal, the State abandoned any argument that the stop was justified based on a violation of the tinted-windows statute, N.J.S.A. 39:3-74."); *State v. McLeod*, No. A-0136-16T1, 2017 WL 2472360, at *4 (N.J. Super. Ct. App. Div. June 8, 2017) ("The tinted windows, themselves a violation of New Jersey's motor vehicle code, *N.J.S.A.* 39:3–74, warranted the stop without consideration of the other circumstances.").

Although no party says so, the State's intent may be to incorporate the regulatory standards of N.J.A.C. § 13:20-33.7:

(d) A motor vehicle, other than a police vehicle or a motor vehicle for which a medical exemption certificate has been issued by the Motor Vehicle Commission in accordance with N.J.S.A. 39:3–75.1 et seq., shall not be certified which has tinted spray or plastic material added to previously approved glazing in the front windshield or windows, vents, wings, deflectors, or side shields to the immediate right or left of the driver, because such condition changes the vision and light transmission properties of the glazing in areas where driver visibility shall not be obscured or obstructed; provided, however, tinted spray or plastic material may be applied to previously approved glazing in the front windshield if such spray or material extends no lower than six inches from the top of the front windshield or such spray or material does not extend below the AS–1 marking on the front windshield.

Note that the regulation completes the circle by incorporating the statutory exception contained in N.J. Stat. Ann. § 39:3-75.1, quoted above.

23

standards, even if a judge or fact finder might later disagree. *See Edwards v. New Jersey Human Servs.*, No. 12-5524, 2016 WL 7013464, at *7 (D.N.J. Nov. 30, 2016) ("[T]he Court finds the fact that Plaintiff's windows were tinted constitutes probable cause and dismisses Count One as to the tinted windows charge."); *Miller v. Waterford Twp.*, No. 11-3405, 2014 WL 345296, at *14 (D.N.J. Jan. 30, 2014) ("If the windows were visible to Lyons, probable cause could be established, as Lyons would have seen the tinted windows.").

Mr. Saint-Jean's argument, however, is different. The windows on his car, he says, *could not* have violated New Jersey law, because his car was registered in Massachusetts (as the officers could plainly see), and he was a Massachusetts resident (as the officers very quickly learned). (Opp. Br. at 18–20). New Jersey does not purport to, and perhaps could not, bind the nation regarding automobile equipment standards. New Jersey law, Mr. Saint-Jean explains, exempts non-resident owners of vehicles duly registered in another state from complying with the New Jersey equipment requirements. (Opp. Br. at 19 (quoting N.J. Stat. Ann. § 39:3–15)).[14] Thus, Saint-Jean argues that he

---

[14]    A "nonresident owner of any motor vehicle or motor-drawn vehicle which has been *registered in accordance with the laws respecting the registration of motor vehicles of the jurisdiction in which the nonresident resides*, and which has conspicuously displayed thereon the registration number thereof, may, *without complying with the provisions of this subtitle with respect to registration and equipment*, operate or permit the operation of such vehicle in this State . . . ." N.J. Stat. Ann. § 39:3–15 (emphasis added).

These New Jersey officers did not purport to enforce Massachusetts law. Mr. Saint-Jean adds, however, that in Massachusetts, "tints over visible light transmittance of thirty-five percent is permitted." (Opp. Br. at 19–20). It seems to be an open question whether the statute's reference to compliance with the foreign state's "laws respecting the registration of motor vehicles" also includes the foreign state's equipment regulations. At any rate, there are no facts or allegations as to whether the

24

was clearly exempt from the New Jersey law, and that therefore the officers

lacked probable cause as a matter of law to arrest or charge him with having

tinted windows.[15]

The probable cause issue, then, is not the usual one: *i.e.,* whether the

officers mistakenly believed the facts rose to the level of establishing probable

cause regarding a state crime. Rather, the issue is whether the officers made a

mistake of law in believing that there was a New Jersey state law prohibiting

the acts they observed.

---

officers had a basis for believing that the windows did or did not comply with
Massachusetts standards.

    I draw a distinction here between the reasonable suspicion required to pull over
Mr. Saint-Jean's automobile, and the probable cause required to subsequently charge
him. When pulling the car over, the officers necessarily observed the automobile and
its windows. They presumably could also see that the car bore Massachusetts license
plates, but they could not then know that the owner was a Massachusetts resident
who had registered the car there. *See State v. Forgione*, 625 A.2d 557, 558–59 (App.
Div. 1993) (stating that the officers could permissibly stop a vehicle for an equipment
violation, even with visible out of state plates, because the New Jersey statute exempts
"non-residents," and "a law enforcement officer cannot ascertain whether an out-of-
state licensed vehicle is owned by a resident of that state without checking the
registration credentials for the vehicle . . . . The only practical way for that
confirmation to occur is for the police officer involved to review the appropriate
credentials. Accordingly, N.J.S.A. 39:3-15 does not proscribe the officer from making a
stop or the officer from requiring the driver to produce registration and driving
credentials when a police officer observes an out-of-state licensed vehicle with an
equipment violation."). Here, Mr. Saint-Jean *did* produce his Massachusetts
registration and driver's license, apparently to no avail.

[15]    Of course, "asserting facts solely in an opposition brief is not a proper
substitute for alleging facts in a complaint" *Sharif v. City of Hackensack*, No. 17-
12410, 2018 WL 5619721, at *4 (D.N.J. Oct. 29, 2018). It is a natural inference from
the Complaint's allegations, however, that the officers, in observing Mr. Saint-Jean's
license, registration, and license plates, were on notice that he was a Massachusetts
resident, operating a vehicle registered in Massachusetts. Thus, I consider the brief
insofar as it adds arguments of law, not new facts.

The Defendants could perhaps be forgiven for failing to anticipate this argument in their main brief, but their reply briefing, too, fails to address it. For that reason alone, I could deem it conceded. I will nevertheless discuss it.

In *Heien v. North Carolina*, 574 U.S. 54 (2014), the U.S. Supreme Court held that a mistake of law could support a finding of reasonable suspicion. As I observed in a prior case, that holding has been extended to encompass probable cause. *See Aleynikov v. McSwain*, No. 15-1170 (KM), 2016 WL 3398581, at *13 (D.N.J. June 15, 2016) (collecting cases). *Heien* put it this way:

> But reasonable men [*sic*] make mistakes of law, too, and such mistakes are no less compatible with the concept of reasonable suspicion. Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground. Whether the facts turn out to be not what was thought, or the law turns out to be not what was thought, the result is the same: The facts are outside the scope of the law. There is no reason, under the text of the Fourth Amendment or our precedents, why this same result should be acceptable when reached by way of a reasonable mistake of fact, but not when reached by way of a similarly reasonable mistake of law.

574 U.S. at 61.

That is not to say, however, that factual and legal mistakes apply in the same way. Factual mistakes tend to involve on-the-spot judgments, which may be based on incomplete information. The reasonableness of legal mistakes, however, must be judged in relation to what the public may expect an officer to know as the result of his or her training:

> Contrary to the suggestion of Heien and amici, our decision does not discourage officers from learning the law. . . . [T]he [mistake of law] inquiry is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation. Thus, an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce.

*Id.* at 66–67.

That "not as forgiving" standard requires that a mistake of law must be assessed from the point of view of a "prudent, cautious, *trained* police officer." *United States v. Romero*, 935 F.3d 1124, 1128 (10th Cir. 2019) (emphasis added) (quoting *United States v. Snow*, 82 F.3d 935, 942 (10th Cir. 1996)). And when applied to an arrest or further pursuit of a criminal charge, as opposed to a brief, reasonable-suspicion *Terry* stop, that standard may require even closer scrutiny.

Of course, the police are not expected to perform a roadside resolution of statutory ambiguities or conflicting legal precedent. Thus, in *United States v. Diaz*, 854 F.3d 197, 204–05 (2d Cir. 2017), the court found that an officer's belief that an apartment-building stairwell is a "public place" for purposes of New York's open-container law was reasonable in light of conflicting precedents. Similarly, in *United States v. Hinton*, 773 F. App'x 732, 734 (4th Cir. 2019), the court agreed that police officers made a reasonable mistake of law in pulling over a vehicle for having high beams on while passing a stopped police vehicle, because courts had not agreed on whether the "oncoming vehicle" may be stationary. *See also United States v. Scott*, 693 F. App'x 835, 838 (11th Cir. 2017) (upholding traffic stop based on failure to signal, because

27

a mistake of law as to whether turn signals are also required for lane changes would have been reasonable).

On the other hand, the police are expected to be trained regarding the laws they enforce. They cannot arrest people based on uninformed beliefs or instincts about what conduct is prohibited. *See Adelman v. Branch*, 784 F. App'x 261, 267 (5th Cir. 2019) ("But Branch's mistake was not reasonable. She didn't misinterpret an unclear policy or law; she simply failed to learn about DART's updated policy" permitting photography on premises of Dallas Area Rapid Transit); *United States v. Romero*, 935 F.3d 1124, 1132 (10th Cir. 2019) (mistake of law not reasonable because the resisting-arrest statute did not cover a situation in which the defendant, while talking back to the officer, offered no resistance and obeyed all commands).

No one can be expected to memorize the entirety of the New Jersey traffic laws. This situation, however, was not a novel or surprising one. Traffic stops for minor motor vehicle infractions appear to be a regular feature of the duties of officers patrolling the highways of our Northeastern corridor state. Common experience teaches that such stops are often followed by requests for consent to search, often wholly unrelated to the basis for the stop. It is therefore not too much to expect that the police should inform themselves as to the technicalities of the laws pursuant to which they may—this bears repeating—

28

stop and even arrest in-state drivers, as well as out-of-state drivers just passing through.[16]

The officers were aware that they were applying New Jersey law to the equipment on an out-of-state car. Officers patrolling highways, like the Palisades Parkway, which are traveled by out-of-state vehicles should be trained in such issues, which recur. To the extent the law might be regarded as complicated or uncertain, all of the uncertainty falls on the side of suggesting that the windows were legal, not illegal. This situation should have at least triggered a duty to check before arresting and detaining a driver.

\*     \*     \*

In sum, probable cause to arrest Mr. Saint-Jean on the drug possession charge remains murky at best. The allegations of the Complaint—that he possessed what appeared to be, and were, Valentine's Day candies—adequately set forth a claim that Saint-Jean was arrested and charged in the absence of probable cause. More facts, such as those regarding the appearance of the candies and the officers' training and experience, might alter the picture. For now, however, the motion to dismiss the claim that the Officer Defendants lacked probable cause to arrest Saint-Jean is denied.

---

[16]     Under federal constitutional law, even minor criminal offenses such as traffic violations may permissibly form the basis for an arrest. Under New Jersey law, however, whether the police may make an arrest solely for a minor motor-vehicle offense remains an "open question." *See Brown v. Makofka*, 644 F. App'x 139, 143 (3d Cir. 2016). But for their belief that the candies contained drugs, the police here might have simply issued a summons for the motor vehicle violation, but that scenario remains speculative.

The thrust of the Fourth Amendment claims is surely the drug offense. I find, however, that the tinted-windows component of the claim is adequately alleged, and deserving of discovery and analysis; in any event, it is part of the totality of the circumstances that might (or might not) have justified the officers' actions. There are, moreover, factual issues as to what the officers' training and experience could or should have led them to believe about the status of the tinted-windows offense with respect to an out-of-state automobile and driver. I discuss these issues further in the following section.

### b. Clearly Established Right

The issue then becomes whether any constitutional right alleged to have been violated was a clearly established one.

The Third Circuit has found that "a right is clearly established for qualified immunity purposes where its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Sharp v. Johnson,* 669 F.3d 144, 159 (3d Cir. 2012) (quoting *Saucier*, 533 U.S. at 202); *see also Williams v. Bitner*, 455 F.3d 186, 191 (3d Cir. 2006). That is to say, the right the official is alleged to have violated must have been "clearly established" in a particularized way, and the court must define the right with the appropriate level of specificity. *Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *Williams*, 455 F.3d at 191; *Sharp*, 669 F.3d at 159. Even if there is no precedent directly on point, however, an action may still violate a clearly established right where a general constitutional rule already identified in the decisional law applies with "obvious clarity" to the specific conduct in question.

*United States v. Lanier*, 520 U.S. 259, 271 (1997); *Hope v. Pelzer,* 536 U.S. 730, 741 (2002); *see also El v. City of Pittsburgh*, 975 F.3d 327, 341 (3d Cir. 2020).

In the Fourth Amendment context, "[a]rrest without probable cause is certainly a clearly established constitutional violation in the abstract . . . . That alone, however, does not end the inquiry." *Janowski v. City of N. Wildwood*, 259 F. Supp. 3d 113, 122 (D.N.J. 2017) (internal citations omitted). The Court must perform a more specific analysis of "the circumstances confronting the officer to determine whether a reasonable state actor could have believed his conduct was lawful." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010); *See Wesby*, 138 S. Ct. at 590 ("The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct *in the particular circumstances* before him.") (emphasis added). "[I]f a reasonable officer might not have known that the conduct was unlawful, then the officer is immune from liability." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).

While early resolution of qualified immunity issues is desirable, factual issues or factual uncertainty may make an assessment impossible at the complaint stage. "[C]rucial to the resolution of any assertion of qualified immunity is a careful examination of the record (preferably by the district court) to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff." *Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir. 1996)). Indeed, some qualified immunity issues may ultimately merge with trial on the merits: "[W]hile we have recognized that it is for the court to decide whether an officer's conduct

31

violated a clearly established constitutional right, we have also acknowledged
that the existence of disputed, historical facts material to the objective
reasonableness of an officer's conduct will give rise to a jury issue." *Curley*, 298
F.3d at 278; *see also Harris v. Zyskowski*, No. 12-7191, 2013 WL 6669186, at
*6 (D.N.J. Dec. 18, 2013) ("This Court is not prepared to hold, as a matter of
law, that [defendant's] behavior was reasonable under the circumstances as
pled in the Complaint.").

Assuming a lack of probable cause, the relevant qualified immunity
questions are as follows: (1) whether the officers were on sufficiently clear
notice that they lacked probable cause to arrest Saint-Jean for possession of
MDMA/Ecstasy, based on Valentine's day candies found in a plastic bag in the
console storage compartment of his vehicle; (2) whether the officers were on
sufficiently clear notice that tinted windows on an out-of-state vehicle owned
by a nonresident did not violate the New Jersey equipment laws (and therefore
could not support probable cause). While the probable cause inquiry itself
makes room for reasonable mistakes, *see supra*, the qualified immunity inquiry
is distinct, and may afford some additional leeway.

As for the drug charge based on the candies, I cannot find on this
undeveloped record that the officers could have reasonably believed that they
possessed probable cause to arrest Mr. Saint-Jean for possession of
MDMA/Ecstasy. As Defendants point out, a body of relevant case law may
furnish a clear answer with respect to a particular probable cause issue. (Mov.
Br. at 21). We do not seem to have that here; Saint-Jean has not provided any

32

U.S. Supreme Court or Court of Appeals case that is factually on point, and I have found none.

Even without such a body of factually on-point case law, however, qualified immunity may be rejected where a more general constitutional standard applies with "obvious clarity" to the specific conduct in question. *Hope,* 536 U.S. at 741; cases cited at pp. 30–31, *supra.* Here, the standard itself is unmistakable: it consists in the essential constitutional principle that there can be no arrest without probable cause. I find that the probable-cause requirement applies with "obvious clarity" to the facts as alleged in the Complaint.

As noted above, the complaint describes the items as candies associated with St. Valentine's Day. Nothing further about their appearance, smell, taste, or other physical qualities appears. The candies were contained in a plastic bag in the console storage compartment, but were not otherwise concealed. Nothing about the officers' training or basis for thinking that the items contained MDMA appears in this undeveloped record. I will not base a finding of qualified immunity on Mr. Saint-Jean's admitted nervousness, or "driving too slowly."[17] These I might treat as corroborating factors, but only if there were something

---

[17] This was one of two stated bases for the car stop, although not the subject of a summons. The Complaint alleges that Saint-Jean's car was traveling "just under the posted speed limit of 50 miles per hour." (Complaint ¶ 21). Defending the reasonableness of the stop, Defendants urge that Saint-Jean was "admittedly traveling under the speed limit" and that this, in itself, was a "violation of the traffic code" (which they do not identify). As such, they argue, it justified the stop, volunteering that this would be so even if the stop was a "pretext" for investigation of crime. (Mov. Br. at 15 n.6; Reply Br. at 7 n.1). I decline to accept a driver's obedience to the speed limit as a reasonable-suspicion or probable-cause factor.

more substantial for them to corroborate. That "something" may emerge in discovery, but the Officer Defendants have not yet had the opportunity to establish it.

In so holding, I agree with *Brian v. Patrick,* the Halloween candy case analyzed at p. 19, *supra*. After holding that the officer had no sufficient basis to conclude that a bag of candy contained MDMA/Ecstasy, that court held that the arrest constituted such a clear violation of Fourth Amendment standards as to preclude qualified immunity:

> In this case the plaintiff has pled sufficient facts that, if true, allege a plausible claim for false arrest under the Fourth Amendment. First, the complaint alleges that the plaintiff was arrested. Second, the facts, if true, establish that the defendant did not have probable cause to arrest the plaintiff. Specifically, prior to the arrest the defendant had no verification that the substance was ecstasy. On the contrary, the plaintiff, two bystanders, and the grocery store employee told the defendant that the substance was Halloween candy. Additionally, an officer within the EBRSO Narcotics Division viewed a picture of the substance that the defendant sent him and stated that it did not look like any ecstasy he had ever seen. Despite this information and without conducting a field test, the defendant arrested the plaintiff for possession of ecstasy. The defendant then submitted the substance to the State Police Crime Lab for testing, which determined that it was, in fact, candy.

> Turning now to the defendant's assertion of qualified immunity, the forgoing analysis demonstrates that the plaintiff sufficiently alleged a constitutional violation. There is no argument that the alleged constitutional violation—arresting the plaintiff without probable cause—if true, was unreasonable in light of the clearly established law. The defendant has not established, at this time, that he is entitled to qualified immunity.

34

*Brian*, 2016 WL 394002 at *3.[18]

I next discuss the "clearly established right" issue in relation to the tinted window charge.

Of course, it clearly violates the Fourth Amendment to arrest someone for, or charge someone with, something that is not a crime under state law. I repeat that the existence of probable cause for the tinted windows arrest does not really require interpretation of U.S. Constitutional law at all. It is simply a matter of the State and its officers being familiar with what the State's own statutes say. While the U.S. Supreme Court is the ultimate arbiter of constitutional law, the State and its officers are competent to read the State's motor vehicle statutes and familiarize themselves with their contents.

As the case progresses, the Court will consider any evidence placed before it as to whether trained officers could have possessed an objectively reasonable belief that an out-of-state vehicle was subject to the New Jersey window tinting prohibition. I do not prejudge the issue, which is factually undeveloped, for the reasons stated in the preceding section.

Defendants' failure to brief the issue only adds to the difficulty of resolving it at this stage. It is not even really clear that the officers *are* claiming that they harbored, or could have harbored, such a belief. Nor do I have evidence before me as to what an officer's training regarding these motor

---

[18]    To be clear, I am not asserting that this district court case constitutes a sufficient body of on-point case law on the probable cause question. Rather, I cite it as persuasive authority to support my conclusion that these facts satisfy the alternative test, *i.e.,* that general Fourth Amendment standards of probable cause apply to these facts with "obvious clarity." *See* pp.30–31, *supra.*

vehicle infractions would or should include. Although I imagine that officers encounter this situation with regularity, which would make a mistake of law less reasonable, I do not know that to be the case, and would certainly entertain a factual showing at the proper time. In short, there is not a clear picture of the totality of the circumstances influencing this mistake-of-law scenario. It is at this point premature to find that a reasonable officer might reasonably have been unaware that the arrest and charge, overall, were not valid under New Jersey law and hence could not furnish a basis for probable cause. While it might or might not be established with a fuller record, qualified immunity must now be denied as to the tinted windows charge.

### 2.      Substantive Due Process Claim (Count V)

"A substantive due process violation is the deprivation of a protected interest involving an abuse of official power that 'shocks the conscience.'" *Prunkel v. Cty. of Bergen*, No. 17-5154, 2018 WL 4043291, at *10 (D.N.J. Aug. 23, 2018) (citing *United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 393, 399 (3d Cir. 2003)). "One such protected interest is fundamental rights, which include those guaranteed by the Bill of Rights, as well as certain liberty and privacy interests implicitly protected by the Due Process Clause." *Id.* (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).

Here, Mr. Saint-Jean broadly alleges that "Defendants abused process by continuously depriving Plaintiff . . . of his substantive rights under the United States Constitution when they had full knowledge that their actions were unlawful and that Plaintiff . . . was innocent of the charge lodged against him."

36

(Complaint ¶ 135). The Officer Defendants argue that Saint-Jean fails to plead sufficient facts to support a violation of Saint-Jean's substantive due process rights. (Mov. Br. at 19 n.9). Saint-Jean does not address this argument. (*See generally* Opp. Br.).

I agree with Defendants that the Complaint's allegations fail to state a claim for a substantive due process violation. To start, the allegations are threadbare and conclusory: Saint-Jean does not allege which of his substantive rights were violated, how they were violated, or which defendants violated them. (*See* Complaint ¶¶ 133–136). Moreover, to the extent the claims arise from Saint-Jean's false arrest and prosecution, they are grounded not in the general standards of substantive due process, but in the specific guarantees of the Fourth Amendment. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing' such a claim." (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989))).

Accordingly, Defendants' motion to dismiss the substantive due process claim on these grounds is also granted.

### 3.    **Procedural Due Process Claim (Count VI)**

Saint-Jean also pleads a procedural due process claim. (Complaint ¶¶ 137–140). Specifically, he alleges that "Defendants initially detained and/or

37

continued the detention of Plaintiff Saint-Jean without a proper due process."
(Complaint ¶ 138).

To plead a § 1983 claim for deprivation of procedural due process, a
plaintiff must allege that "(1) he was deprived of an individual interest included
within the Fourteenth Amendment's protection of 'life, liberty, or property,' and
(2) the procedures available to him did not provide 'due process of law.'"
*Simmons v. Roxbury Police Dep't*, No. 17-2526, 2017 WL 5188060, at *8 (D.N.J.
Nov. 9, 2017) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d
Cir. 2006)).

As Defendants argue, Saint-Jean's threadbare assertion of a procedural
due process violation does not suffice. Saint-Jean does not plead "what process
he was owed [or] how that process was denied." *Washington v. Hanshaw*, 552
F. App'x 169, 174 (3d Cir. 2014). Therefore, this claim is also dismissed for
failure to state a claim.

### 4.    Failure to Supervise (Count III)

The last federal claim is one of "failure to supervise." (Complaint ¶¶ 103–
114). Although Saint-Jean alleges this claim against "all Defendants," there are
no factual allegations regarding any failure to supervise by any of the
individual defendant officers. (Mov. Br. at 41 n.13). Instead, the claim really
seems to be a claim against the County of Bergen (voluntarily dismissed from
this action) and PIPC (dismissed above).

Without any allegations related to the Officer Defendants' failure to supervise, this claim against them must also be dismissed. *See Grieco v. Lanigan*, No. 15-7881, 2017 WL 384689, at *5 (D.N.J. Jan. 27, 2017).

## IV.    STATE LAW CLAIMS (COUNTS VII, VIII)

The federal law claims have all been dismissed against PIPC, PIPPD, and Prosecutor Samson. As to them, I now consider the state law claims contained in Counts VII and VIII. I hold that these state law claims against PIPC, PIPPD, and Prosecutor Samson must be dismissed on grounds of sovereign immunity and failure to state a claim. As for the Officer Defendants, the state law claims parallel the federal claims, so the motion to dismiss Counts VII and VIII is denied.

### A.    PIPC and PIPPD

Saint-Jean argues that PIPC and PIPPD do not enjoy sovereign immunity from the pendent state law claims because the New Jersey Tort Claims Act ("TCA") allows suits against public entities and their employees. (Opp. Br. at 28–29). Defendants counter that the TCA does not abrogate sovereign immunity as to the state law claims in federal court, and that no other waiver of immunity applies. (Reply Br. at 12). In this important respect, the plaintiff's choice of a federal forum may have been ill-advised.

The Eleventh Amendment confers immunity from suit *in a federal court.* Therefore, unless a state has waived immunity from suit *in federal court,* a state-law cause of action cannot be maintained there. The Third Circuit has stated, albeit in a non-precedential decision, that "[t]he [New Jersey] TCA,

which allows suits against public entities and their employees in *state courts*, does not expressly consent to suit in *federal courts* and thus is not an Eleventh Amendment waiver." *Hyatt v. Cty. of Passaic*, 340 F. Appx 833, 837 (3d Cir. 2009) (emphasis added). And this district generally has followed the reasoning of the *Hyatt* decision when confronted with this issue. *See e.g.*, *Doe v. New Jersey Dep't of Corr.*, No. 14-5284, 2015 WL 3448233, at *7 (D.N.J. May 29, 2015) ("Even when a state consents to a suit in its own courts, it does not follow that a similar suit may be maintained against the state in federal courts."); *NJSR Surgical Ctr., L.L.C. v. Horizon Blue Cross Blue Shield of New Jersey, Inc.*, 979 F. Supp. 2d 513, 519 (D.N.J. 2013) (explaining that "the TCA has repeatedly been held to authorize suit *only* in state court.").

Accordingly, and because no other exception to sovereign immunity applies (*see* Reply Br. at 12–13), PIPC and PIPPD are entitled to sovereign immunity from the state law claims if they are asserted in federal court. On this alternative ground, the motion to dismiss the state law claims against PIPC and PIPPD is granted.

### B.   Prosecutor Samson

Prosecutor Samson does not enjoy the same scope of immunity under New Jersey law as he does under federal law. *See* Section III.B, *supra*. Nevertheless, the facts as pled do not suffice to pierce the prosecutor's state-law immunity.

Under New Jersey law, "prosecutorial immunity is not absolute like its federal counterpart." *Newsome v. City of Newark*, No. 13- 06234, 2014 WL

4798783, at *4 (D.N.J. Sept. 25, 2014). The TCA's prosecutorial immunity provision provides that "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment." N.J. Stat. Ann. § 59:3-8. However, prosecutorial immunity in New Jersey is narrower than its federal counterpart: a prosecutor is not exonerated from liability "if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice, or willful misconduct." *Newsome*, 2014 WL 4798783, at *5 (quoting N.J. Stat. Ann. § 59:3-14a).

Mr. Saint-Jean argues that Prosecutor Samson is not entitled to state-law immunity because his conduct "can only be considered actual fraud, actual malice, and willful misconduct." (Opp. Br. at 26). Specifically, Saint-Jean alleges that Samson continued prosecuting Saint-Jean when there was "irrefutable evidence" of his innocence, and that Samson did so in order to "cover up" the unconstitutional actions of the Officer Defendants. (*See* Complaint ¶¶ 61, 63 & 108). Saint-Jean also alleges that "Defendant(s) demonstrated their malicious intent by requiring Saint-Jean to either accept an Adjournment in Contemplation of Dismissal . . . or plead guilty to the charges, despite having incontrovertible evidence that Plaintiff was innocent of the charges." (*Id.* ¶ 97). Finally, Saint-Jean generally alleges that "the prosecution of Plaintiff was initiated and continued by Defendants with malice," and that "Plaintiff's race was the motivating factor behind the decision to prosecute Plaintiff." (*Id.* ¶¶ 86–87).

41

These allegations do not contain facts that plausibly set forth fraud, malice, or willful misconduct on the part of Prosecutor Samson. Samson's decision to continue the prosecution, alone, is insufficient to overcome immunity under New Jersey law. *See Van Engelen v. O'Leary*, 732 A.2d 540, 548 (N.J. Super. Ct. App. Div. 1999) (explaining that conduct "does not render the statutory immunity inapplicable unless it bespeaks a deliberate action, taken for [the prosecutor's] own improper purposes. Carelessness, unreasonable conduct or even noncompliance with substantive law would not have that effect."). And, without more factual allegations, the purported improper motives provided by Saint-Jean—Plaintiff's race and a cover-up operation—are speculative and conclusory. No facts suggesting racial bias are alleged, and presumably a prosecutor who wished to "cover up" the unconstitutional conduct of the police would drop, not pursue, the case. *See Small v. State*, No. A-4113-13T4, 2015 WL 1057840, at \*5 (N.J. Super. Ct. App. Div. Mar. 12, 2015) ("[P]laintiffs' bare allegations of malice must fail."); *Bovery v. Monmouth Cty. Prosecutor's Office*, No. A-2940-18T3, 2020 WL 5544108, at \*5 (N.J. Super. Ct. App. Div. Sept. 16, 2020) (allegations were "plainly insufficient to properly aver that the actions of the individual defendants constituted actual fraud, actual malice or willful misconduct such as to abrogate defendants' statutorily-granted immunity."); *Castro v. Atl. Cty.*, No. 15-02041, 2018 WL 3122065, at \*10 (D.N.J. June 25, 2018) ("Plaintiff's collective and conclusory allegations of the [p]rosecutor [d]efendants' actions relative to

the investigation and prosecution are insufficient to overcome the protections of their prosecutorial immunity.").

On this alternative ground, the motion to dismiss the state law claims, Counts VII and VIII, against Prosecutor Samson for failure to state a claim is granted.

### C.   Officer Defendants

As to the Officer Defendants, the motion to dismiss the federal-law claims has already been denied on qualified immunity grounds, and the result as to the state law claims is the same.

The immunity standards governing the state law claims against the Officer Defendants parallel those of federal law. "In determining whether an employee has established qualified immunity under *N.J.S.A.* 59:3–3, the court applies the same standards of objective reasonableness that are used in federal civil rights cases." *N.E. for J.V. v. State Dep't of Children & Families, Div. of Youth & Family Servs.*, 158 A.3d 44, 59 (N.J. Super. Ct. App. Div. 2017). That is, "[a] court must examine whether the actor's allegedly wrongful conduct was objectively reasonable in light of the facts known to him or her at the time. . . . Objective reasonableness will be established if the actor's conduct did not violate a clearly established constitutional or statutory right." *Id.* (internal citations omitted).

As in *Hof v. Janci*, "because the Court finds that Defendant is not entitled to qualified immunity for the § 1983 claim, the Court likewise finds Defendant is not entitled to immunity under the NJTCA." No. 17-295, 2018 WL

6318381, at *7 (D.N.J. Dec. 3, 2018). Accordingly, the motion to dismiss the state law claims, Counts VII and VIII, as against the Officer Defendants is denied.

## V.   LEAVE TO AMEND

Saint-Jean requests an opportunity to amend his complaint to cure any pleading deficiencies identified by the Court. (Opp. Br. at 30 n. 5). I will grant Saint-Jean a period of 30 days to file an amended complaint that addresses and cures the deficiencies identified in this Opinion.

## VI.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint is GRANTED as to defendants PIPC, PIPPD, and Prosecutor Samson. The motion to dismiss is GRANTED IN PART and DENIED IN PART as to the Officer Defendants. That dismissal is without prejudice to the submission, within 30 days, of a proposed amended complaint. The action was voluntarily dismissed as against the remaining defendant, the County of Bergen.

For clarity, what currently remains of the case is contained in Counts I, II, VII, and VIII, to the extent they are asserted against the Officer Defendants. An appropriate Order accompanies this Opinion.

Dated: December 28, 2020

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**